UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| ANTHONY CORNIEL,<br><br>Plaintiff<br><br>v.<br><br>NAPHCARE, et. al.<br><br>Defendants | Case No.: 3:18-cv-00157-MMD-WGC<br><br>**Report & Recommendation of<br>United States Magistrate Judge**<br><br>Re: ECF No. 23 |

This Report and Recommendation is made to the Honorable Miranda M. Du, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

Before the court is Defendants' Motion for Summary Judgment. (ECF Nos. 23, 23-1 to 23-3.) Plaintiff did not file a response.

After a thorough review, it is recommended that Defendants' motion be granted.

## I. BACKGROUND

When Plaintiff filed this action he was housed at the Washoe County Detention Facility (WCDF), and was presumably a pretrial detainee. He filed this action pro se pursuant to 42 U.S.C. § 1983. (Compl., ECF No. 7.)

The court screened the complaint, and allowed Plaintiff to proceed with a Fourteenth Amendment denial of adequate medical care claim against defendants Physician Candace, Nurse Jamie, Nurse Jennifer, and Nurse Porche. Naphcare and WCDF were dismissed as defendants. (ECF No. 6.) The defendants were later clarified to be: Jennifer Blue, RN; Jamie Vargas, RN; Porsche Hill, RN; and Kandice Schultz, NP.

Plaintiff alleges that he broke his right hand trying to defend himself in a cell on October 6, 2017. His right index finger was pushed back and out of place, and one of his right knuckles was pushed back. After the altercation, he claims that jail officials put him in the "hole" for 20 days before giving him any medical care. At that point, they x-rayed his hand, but delayed medical care for him. When they found out his hand was broken, he avers that staff lied and tried to suggest Plaintiff refused medical treatment even though he requested treatment and x-rays daily. He claims that the staff failed to respond to his requests on several occasions. On March 21, 2018, jail officials sent him to an outside specialist, who said that his hand had to be re-broken and put in a cast because he had not received necessary medical treatment in a timely manner, and Plaintiff needed pins put into his hand to get it back into place. He was in significant pain, and due to the stress and pain of his hand injury and lack of treatment, he avers that he suffered two heart attacks.

Defendants move for summary judgment arguing that Plaintiff received appropriate medical treatment. Plaintiff did not file a response.[1]

## **II. LEGAL STANDARD**

The legal standard governing this motion is well settled: a party is entitled to summary judgment when "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Cartrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)). An issue is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if it could affect the outcome

---

[1] Both Defendants' motion (ECF No. 23) and the court's *Klingele* order (ECF No. 24) were served on Plaintiff at his address of record, at Southern Desert Correctional Center.

of the case. *Id*. at 248 (disputes over facts that might affect the outcome will preclude summary judgment, but factual disputes which are irrelevant or unnecessary are not considered). On the other hand, where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *Anderson*, 477 U.S. at 250.

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted); *see also Celotex,* 477 U.S. at 323-24 (purpose of summary judgment is "to isolate and dispose of factually unsupported claims"); *Anderson,* 477 U.S. at 252 (purpose of summary judgment is to determine whether a case "is so one-sided that one party must prevail as a matter of law"). In considering a motion for summary judgment, all reasonable inferences are drawn in the light most favorable to the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citation omitted); *Kaiser Cement Corp. v. Fischbach & Moore Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). That being said, "if the evidence of the nonmoving party "is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-250 (citations omitted). The court's function is not to weigh the evidence and determine the truth or to make credibility determinations. *Celotex,* 477 U.S. at 249, 255; *Anderson*, 477 U.S. at 249.

In deciding a motion for summary judgment, the court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'… In such a case, the moving party has the initial burden of establishing the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations

omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party cannot establish an element essential to that party's case on which that party will have the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party need not establish a genuine dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Matsushita*, 475 U.S. at 587. Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

### III. DISCUSSION

**A. Standard**

The Ninth Circuit previously applied the Eighth Amendment deliberate indifference standard to medical care claims brought by pretrial detainees. *Gibson v. County of Washoe*, 290 F.3d 1175, 1187 (9th Cir. 2002) (the Fourteenth Amendment "imposes, at a minimum, the same duty the Eighth Amendment imposes: persons in custody have the established right to not have officials remain deliberately indifferent to their serious medical needs"). The Eighth Amendment

4

deliberate indifference standard applied to convicted prisoners has both an objective and subjective component. The objective component is whether the medical need is sufficiently serious. The subjective component is whether the defendant knew of and disregarded an excessive risk to the inmate's health or safety. *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *rev'd on other grounds, WMX Tech, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997); *see also Akhtar v. Mesa*, 698 F.3d 1202, 1213 (9th Cir. 2012).

In *Gordon v. County of Orange*, the Ninth Circuit concluded that "claims for violations of the right to adequate medical care 'brought by pretrial detainees against individuals under the Fourteenth Amendment' must be evaluated under an objective deliberate indifference standard[.]" 888 F.3d 1118, 1124-25 (9th Cir. 2018).  The elements of such a claim are:

> (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved-making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

*Id*.

With respect to the third element, the conduct must be "objectively unreasonable, a test that will necessarily 'turn[ ] on the facts and circumstances of each particular case.'" *Id*. (citation omitted).

"The mere lack of due care by a state official does not deprive an individual of life, liberty, or property under the Fourteenth Amendment." *Id*. at 1125 (citation and quotation marks omitted). "Thus, the plaintiff must prove more than negligence but less than subjective intent— something akin to reckless disregard." *Id*. (citation and quotation marks omitted).

## B. Analysis

Defendants have presented the following evidence:

On October 6, 2017, Plaintiff presented in the infirmary to Barbara House, RN, complaining of an injury to his right hand. (ECF No. 23-2 at 533.) He reported he had hit the wall after receiving a "bad phone call." Nurse House noted there was a 1 centimeter laceration on the hand above the first knuckle and first finger, bruising and deformity to the first knuckle and first finger, and possibly the first knuckle of the second finger. Photographs were taken of the injury, and the laceration was cleaned with saline, steri-strips were applied, and the hand/knuckles were wrapped with gauze. Plaintiff was given an ice pack and advised to return to the infirmary if blood saturated the wound dressing. The plan was for him to see a nurse practitioner for possible x-rays of the hands/fingers. (*Id.*) Naproxen was renewed on October 7, 2017. (*Id.*)

On October 8, 2017, Plaintiff saw Jennifer Snidow, NP, and complained of pain and swelling in his right hand. He reported he was involved in an altercation, but prison staff said he hit the wall of his cell with his right hand. NP Snidow noted the right hand was extremely edematous, including the fingers. There was a small abrasion with steri-strips applied. There were no signs or symptoms of infection. Plaintiff was able to move his fingers, but with pain. (*Id.* at 532.) NP Snidow assessed Plaintiff with a possible fracture of the right hand. The plan was to order an x-ray. Plaintiff was advised to notify the deputies if he could not move his fingers. (*Id.* at 533.)

On October 9, 2017, Plaintiff saw Isela Barrera, licensed practical nurse. She noted a small abrasion on the top of his right hand, that was not deep. He was given a small island

1  dressing for the wound, a new Ace wrap for the hand, and the plan was still to proceed with an x-
2  ray. (*Id.* at 532.)

3      An x-ray was scheduled for October 10, 2017, but the records indicate that Plaintiff
4  refused. (*Id*. at 510.) An x-ray of the right hand was ordered again on October 15, 2017. (*Id*.)

5      On October 19, 2017, Dr. Rajvee Shah reviewed an x-ray of Plaintiff's right hand. There
6  was a minimally displaced and mildly impacted fracture involving the index finger metacarpal
7  neck with adjacent soft tissue swelling. There were also moderate thumb carpometacarpal joint
8  degenerative changes present. Dr. Shah's impression was: index finger metacarpal neck fracture.
9  (*Id*. at 154.)

10      On October 24, 2017, Kandice Schultz, NP, placed a carpal cast for the right second
11  metacarpal neck fracture. (*Id.* at 461, 531.) The next day, Rebecca Privette, RN, noted Plaintiff
12  had reported to a deputy he was having pain under the cast. Nurse Privette noted the fingers were
13  slightly swollen but Plaintiff was able to move the non-fractured fingers. His skin was warm and
14  dry, and his pulse was intact. He was educated on the healing process and advised to keep his
15  arm elevated. He was given pain medication and ice. (*Id*. at 531.)

16      On October 31, 2017, Plaintiff complained of pain in his right hand to Ms. Schultz. He
17  said he had punched someone on October 6, 2017, and had broken his right hand. Ms. Schultz
18  noted an x-ray had been ordered on October 7, 2017, and on October 10, 2017, Plaintiff had
19  refused to proceed. The x-ray was re-ordered, and completed on October 19, 2017, and a
20  cast/splint was placed on October 24, 2017. Plaintiff indicated that neither the splint nor the
21  naproxen was helping his pain. (*Id*. at 530.) Plaintiff complained of tenderness in the affected
22  finger. It was discolored and slightly cooler, but warm. The finger appeared compressed into the
23  metacarpal with swelling at the metacarpal. Plaintiff could move the finger, with passive flexion

and extension limited due to pain. The third, fourth and fifth fingers were slightly swollen, but not tender. She assessed him with a right index metacarpal fracture. The plan was to have Plaintiff seen by an orthopedic surgeon, to give him Tramadol for pain, and to maintain the splint to help with the pain and protect from further injury. He was instructed to move the third, fourth, and fifth fingers while elevated as tolerated. (*Id*. at 530-31.)

That same day, Ms. Schultz completed a request for off-site consultation with an orthopedic surgeon. Plaintiff was scheduled to be seen by Dr. Kirk Kaiser, an orthopedic surgeon, on November 14, 2017. (*Id*. at 146.)

On November 5, 2017, Ms. Snidow renewed Plaintiff's Naproxen prescription. (*Id*. at 530.)

Plaintiff saw Dr. Kaiser on November 14, 2017. Dr. Kaiser noted a healing comminuted fracture. He prescribed a splint, and recommended range of motion exercises, and occupational therapy, if available. The plan was for Plaintiff to return in five to six weeks for follow up. (*Id*. at 69.)

On November 15, 2017, Ms. Schultz reviewed Dr. Kaiser's notes, and indicated that medical staff could follow up with Plaintiff at WCDF and re-evaluate in five to six weeks. (*Id*. at 529.)

Ms. Schultz saw Plaintiff on November 29, 2017. He was still taking Tramadol three times a day, as well as Tylenol, for his pain. She noted Plaintiff was to continue his range of motion exercises per Dr. Kaiser, and was to follow up in five to six weeks. (*Id*. at 527.)

On December 5, 2017, Plaintiff saw Sandra Boxx, licensed practical nurse, and complained of pain and tingling in the right hand. She offered to place him on sick call, and he

1  refused due to the cost. Plaintiff said he had stopped performing the range of motion exercises
2  due to pain. Ms. Boxx advised him to contact nursing staff if his pain became worse. (*Id.* at 527.)
3        On December 15, 2017, Plaintiff saw Marie-Therese Kish, licensed practical nurse, and
4  complained of severe pain in the right hand. Ms. Kish noted that Plaintiff's prescription for
5  Tramadol had expired after the dose he had taken that day. She encouraged him to keep his hand
6  elevated, to keep the brace on the hand, and not to perform exercises "after PM." (*Id.* at 527.)
7        Plaintiff saw Ms. Schultz on December 18, 2017, and she noted he was to continue his
8  range of motion exercises and receive Tylenol and ibuprofen for pain. (*Id.* at 525.)
9        On December 27, 2017, Plaintiff presented to Jimmy Groves, licensed practical nurse,
10 complaining of anxiety, and stating no one was doing anything about his hand. He said he
11 needed better pain medication. Mr. Groves noted the skin color was normal and the skin was
12 warm to the touch and dry. (*Id.* at 526.)
13       Between January 2, 2018, and January 14, 2018,  Plaintiff was seen on several occasions
14 for complaints of chest pain. (*Id.* at 525-26.) On January 14, 2018, he noted that his finger was
15 "broken" and complained that it hurt and what he was given for pain was not working. (*Id.* at
16 525.) The plan was to notify the provider of his concerns. (*Id.*) Ms. Snidow stated that Plaintiff
17 had not had Tramadol since the middle of December, and she saw no reason to re-start it, but she
18 gave him a one-time shot of Toradol for his pain, and continued him on Tylenol for pain
19 management. (*Id.*)
20       On January 18, 2018, Plaintiff saw Ms. Schultz. She noted the plan was to continue to
21 monitor his hand. (*Id.*) On January 31, 2018, she renewed the prescription for Tylenol at
22 Plaintiff's request. (*Id.*)
23

On February 19, 2018, Plaintiff saw Jamie Vargas, licensed practical nurse, in the infirmary, and he complained of chest pain and numbness in his fingers, stating it was probably anxiety. Ms. Vargas offered an electrocardiogram (EKG), which Plaintiff refused. He was offered Tylenol, which he also refused. He was advised to notify deputies if he did not feel better, or if he felt worse. (*Id*. at 522.)

On February 20, 2018, Ms. Schultz noted Plaintiff had been referred to a specialist to evaluate his right finger/hand. (*Id*. at 522.)

Between February 22, 2018, and March 6, 2018, Plaintiff was seen on several occasions for various problems including complaints of chest pain. (*Id*. at 520-521.) On February 23, 2018, Plaintiff reported he was still exercising, doing push-ups and pull-ups, following a recent heart attack. (*Id*. at 521.)

On March 16, 2018, Plaintiff saw Ms. Schultz for a follow up for his right hand. She requested another referral to an orthopedic surgeon, but noted the fracture was stable and healed, and there had been no indication from Dr. Kaiser that surgery was necessary. She recommended continued active and passive range of motion exercises. She noted Plaintiff was scheduled to see Dr. Kaiser that month. (*Id*. at 520.)

On April 3, 2018, Plaintiff saw Trudy Presutti, RN, and complained of pain in the right index finger from the knuckle, radiating upwards. He said he did not need to wear the support brace a lot. Plaintiff was able to open and close the right hand, with pain. There was minimal swelling, and no redness or sign of infection. The plan was to notify the provider of Plaintiff's request to renew the Tylenol prescription. (*Id*. at 520.)

He saw medical staff various times between April 5, 2018, and July 5, 2018, but the notes did not reflect complaints regarding his right hand. (AR 518-519.) He was released from WCDF on July 6, 2018.

Defendants also retained an orthopedic surgeon as an expert, Dr. James Van den Bogaerde, who reviewed Plaintiff's medical records. Dr. Van den Bogaerde opines that Plaintiff received appropriate care that was within the standard of care. He states that Plaintiff was initially treated appropriately with immobilization with a splint and then with pain medications. When his complaints of pain persisted, he was appropriately referred to Dr. Kaiser, who still recommended non-operative treatment. Ms. Schultz determined it was unnecessary for Plaintiff to return to Dr. Kaiser because his injury could be monitored by the medical providers at the jail, and Dr. Van den Bogaerde determined that decision was appropriate and within the standard of care because it was not necessary for an orthopedic surgeon to monitor healing of a nonsurgical fracture. While it was not clear if Plaintiff returned to see Dr. Kaiser in March of 2018, Dr. Van den Bogaerde said the standard of care did not require this because the care he received at WCDF was appropriate. (ECF No. 23-3.)

In sum, Defendants have presented unrefuted evidence that the treatment Plaintiff received by the Defendants at WCDF was objectively reasonable and within the standard of care. The evidence does not reflect that Defendants put Plaintiff at a substantial risk of suffering a serious harm.  Therefore, summary judgment should be granted in Defendants' favor.

## IV. RECOMMENDATION

IT IS HEREBY RECOMMENDED that the District Judge enter an order **GRANTING** Defendants' motion for summary judgment (ECF No. 23).

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of being served with a copy of the Report and Recommendation. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

Dated: May 20, 2020

                                                 _William G. Cobb_  
                                                 William G. Cobb  
                                                 United States Magistrate Judge